916 P.2d 1210

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Daniel VINGE, Defendant–Appellant.**

**No. 16995.**

Supreme Court of Hawai'i.

May 13, 1996.

---

Joy Yanagida, on the briefs, Wailuku, for defendant-appellant.

Mark R. Simonds, Deputy Prosecuting Attorney, County of Maui, on the briefs, Wailuku, for plaintiff-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

RAMIL, Justice.

Defendant-appellant Daniel Vinge was convicted on several counts related to the robbery of Honsport Sporting Store (Honsport) at Ka'ahumanu Shopping Center in Kahului, Maui, Hawai'i. Vinge argues the following points of error on appeal: (1) the trial court abused its discretion in denying Vinge's special jury instruction on eyewitnesses, because the prosecution's case hinged on a single eyewitness; (2) the trial court erred in denying Vinge's motion for judgment of acquittal on the charges of first degree burglary and attempted theft in the first and second degrees, because those charges were included offenses of robbery in the first degree, of which Vinge was convicted; (3) the trial court violated the due process clause of the Hawai'i Constitution when it failed to give notice that consecutive sentences were at issue; and (4) the trial court violated Vinge's first amendment right to freedom of association and the due process clause of the Hawai'i and United States Constitutions, when it relied on Vinge's membership with the "Hawaiian Homes Gang" as a basis for imposing consecutive sentences.

For the reasons discussed below, we affirm the court's judgment and guilty convictions for all charges except the included offenses of attempted theft in the first and second degrees, which we reverse. Furthermore, we vacate Vinge's sentence and remand this case for resentencing.

## I. FACTS

### A. The Honsport Robbery

On July 4, 1992, Vinge was seventeen-years-old. At approximately 1:00 a.m. on that day, three males broke into Honsport at the Ka'ahumanu Shopping Center on the island of Maui, triggering the store's silent burglar alarm. Responding to the alarm

were Maui police officers Mark Aveiro and Chris Navarro.

While Officer Navarro checked the rear of the store, Officer Aveiro investigated the front. Through the glass entrance of Honsport, Officer Aveiro observed an individual wearing a red devil Halloween mask crouching behind a gun counter in the rear of the store. Officer Aveiro then entered the store through a broken display window and attempted to capture the culprit.

When Officer Aveiro entered the store, a different masked individual bearing a rifle bolted toward the broken display window at the front of the store. Before exiting the store, the individual paused and aimed his rifle at Officer Aveiro who quickly fired one round in defense. Startled, the individual dropped the rifle and fled the store through the opening in the store's display window.

A second masked individual sprinted down the main aisle of Honsport holding a machete. Like the first culprit, this second individual escaped through the broken display window.

A third individual, wearing a red devil Halloween mask and clutching a rifle, ran down the same main aisle toward the broken display window. Before exiting the store, this third individual pointed his rifle at Officer Aveiro. Before this assailant could shoot, Officer Aveiro fired his revolver. The third individual immediately yelled in pain but managed to escape through the opening of the display window in the front of the store.

Meanwhile, the shopping center security guard, Hillary Atai, was investigating the police activity in the front of the mall. Approaching the front of the mall, Atai observed the first and second individuals running down the mall. Although he did not see the face of the first individual, Atai did manage to get a better look at the second individual and ultimately identified him at trial as being Vinge.

### B. Grand Jury Review

On July 10, 1992, six days after the incident, the prosecution presented a proposed indictment to the grand jury for review. The grand jury did not endorse the proposed indictment as a true bill because, *inter alia,* it determined that more evidence was necessary.

On July 24, 1992, the prosecution re-presented its case before the grand jury. The grand jury returned a true bill and indicted Vinge on the following seven counts: (1) first degree robbery, in violation of HRS § 708–840(1)(b)(ii) (1993);[1] (2) first degree burglary, in violation of HRS § 708–810(1)(a) (1993);[2] (3) first degree attempted theft, in violation of HRS § 705–500 (1993)[3] and 708–

---

1. HRS § 708–840(1)(b)(ii) provides in pertinent part:

 (1) A person commits the offense of robbery in the first degree if, in the course of committing theft:

 . . . .

 (b) The person is armed with a dangerous instrument and:

 . . . .

 (ii) The person threatens the imminent use of force against the person of anyone who is present with intent to compel acquiescence to the taking of or escaping with the property.

2. HRS § 708–810(1)(a) provides:

 (1) A person commits the offense of burglary in the first degree if the person intentionally enters or remains unlawful in a building, with intent to commit therein a crime against a person or against property rights, and:

 (a) The person is armed with a dangerous instrument in the course of committing the offense[.]

3. HRS § 705–500 provides:

 (1) A person is guilty of an attempt to commit a crime if the person:

 (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or

 (b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in his commission of the crime.

 (2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

 (3) Conduct shall not be considered a substantial step under this section unless it is strongly

830.5 (Supp.1992);[4] (4) second degree attempted theft, in violation of HRS §§ 705–500 (1993) and 708–831(1)(a) (Supp.1992);[5] (5) second degree criminal property damage, in violation of HRS § 708–821(1)(b) (1993);[6] (6) prohibited possession of a firearm, in violation of HRS § 134–7(d) (1993);[7] and (7) use of a deadly weapon in the commission of a crime, in violation of HRS § 134–51(b) (1993).[8]

## C. *Vinge's Trial*

Vinge's jury trial commenced on January 12, 1993. The prosecution presented circumstantial evidence that identified Vinge as the second individual involved in the Honsport robbery. The evidence included, *inter alia*, testimony indicating that: (1) Warren Perreira was the person shot during the Honsport robbery; (2) Perreira was an acquaintance of Vinge; (3) Warren Perreira and other neighborhood boys frequently visited Vinge's home; and (4) these boys referred to themselves as the "Hawaiian Home Boys." The defense countered with, *inter alia*, testimony indicating that the Hawaiian Home Boys consisted of neighborhood friends who lived in the Hawaiian Homes area, were proud of where they lived, watched television together, carpooled together, fished together, and were even active in a boxing club, called the Hawaiian Home Boxing Club.

The only direct evidence that placed Vinge near the scene of the crime was the eyewitness testimony of Atai.

corroborative of the defendant's criminal intent.

4. HRS § 708–830.5 provided in relevant part:
 (1) A person commits the offense of theft in the first degree if the person commits theft:
 (a) Of property, the value of which exceeds $20,000;
 (b) Of a firearm; or
 (c) Of dynamite or other explosive.

5. HRS § 708–831(1)(a) provided:
 (1) A person commits the offense of theft in the second degree if the person commits theft:
 (a) Of property from the person of another[.]

6. HRS § 708–821(1)(b) provides in relevant part:
 (1) A person commits the offense of criminal property damage in the second degree if:

### 1. *Atai's Testimony*

On direct examination, Atai testified that the lighting in the mall was "real good" on the morning of the robbery and that he remembered seeing the second individual run toward him for about five to ten seconds. The prosecution then asked Atai to look at Vinge for five to ten seconds. Atai responded that, "except for his haircut [at trial], . . . there's no doubt that [Vinge] is the individual that I saw that [morning]."

Atai also testified on direct examination that, four days after the robbery, he participated in a photographic line-up and took thirty seconds to pick the photograph of the second individual, who was later identified as Vinge. In addition, Atai testified in detail as to the physical description of the second individual. On the evening of the Honsport robbery, Atai remembered that the second individual wore "a three tiered colored shirt with a green top, a red stripe through the center which was approximately six inches wide and a brown color bottom . . . and dark colored trousers." Atai testified that the second individual was a local male with dark complexion, between one hundred twenty-five and one hundred forty pounds, and approximately five feet six inches tall. Atai further recalled that the second individual was not wearing a mask and had an oblong face and shoulder length hair with waves on the side "where it would flair out on the shoulders."

On cross-examination of Atai, defense counsel elicited, *inter alia*, that: (1) there was not a lot of lighting in the mall on the morning of the robbery; (2) the second indi-

. . . .
 (b) The person intentionally damages the property of another, without the other's consent, in an amount exceeding $500.

7. HRS § 134–7(d) provides that "[n]o person who is less than twenty-five years old and has been adjudicated by the family court to have committed a felony, two or more crimes of violence, or an illegal sale of any drug shall own, possess or control any firearm or ammunition therefor."

8. HRS § 134–51(b) provides that "[w]hoever knowingly possesses or intentionally uses or threatens to use a deadly or dangerous weapon while engaged in the commission of a crime shall be guilty of a class C felony."

vidual was running very fast; (3) the second individual may have been wearing a mask; (4) at the July 10, 1992 grand jury hearing, Atai testified that the second individual wore light colored pants but also stated that "[he] [did]n't know exactly who it was, what [he] saw"; (5) when the police first asked Atai to describe the second individual within minutes after the robbery, Atai did not mention any facial characteristics, the length or color of the robber's hair, or the color of the robber's skin; and (6) during the photographic line-up, Atai had difficulty choosing between two photographs, but eventually narrowed his choice to Vinge's photograph because it "best resemble[d]" the individual he saw that night.

On redirect examination, Atai asserted that he had no doubt in his mind that Vinge was the person he saw on the night of the Honsport robbery.

## 2. *Closing Arguments*

During closing arguments, Vinge's defense counsel explained to the jury that:

> The issue, and only real issue here, is whether or not the [prosecution] has proven beyond a reasonable doubt that Daniel Vinge was the one responsible. . . .

> [The prosecution] say[s] they have an eye witness. And that's what you have to determine, whether or not you can believe this eye witness, whether or not he's worthy of credibility, whether or not he's worthy of your belief. You put the weight on whether or not—what he said, how much you can—determine for yourself how much you're going to accept. . . . You have to determine for yourself whether or not you can find that Hillary Atai, the security guard, the only eye witness who says that . . . Vinge is the one he saw, is worthy of your belief.

Vinge's defense counsel also argued, *inter alia,* that Atai's testimony was not credible and detailed several instances where Atai's description of the second robber was inconsistent and uncertain and seemed to improve over time.

## 3. *Jury Instructions*

The trial court denied defense counsel's request for a special jury instruction relating to eyewitness testimony that included, among other factors:

> The opportunity of the witness to observe the alleged criminal act and the perpetrator of the act;

> The stress, if any, to which the witness was subject at the time of the observation;

> The witness' ability, following the observation, to provide a description of the perpetrator of the act;

> The extent to which the defendant fits or does not fit the description of the perpetrator previously given by the witness;

> The cross-racial or ethnic nature of the identification;

> The witness' capacity to make an identification;

> Evidence relating to the witness' ability to identify other alleged perpetrators of the criminal act;

> Whether the witness was able to identify the alleged perpetrator in a photographic or physical lineup;

> The period of time between the alleged criminal act and the witness' identification;

> Whether the witness had prior contacts with the alleged perpetrator;

> The extent to which the witness is either certain or uncertain of the identification;

> Whether the witness identification is in fact the product of his own recollection;

> Any other evidence relating to the witness' ability to make an identification.

Record on Appeal at 159 (citing CALJIC 2.29 (5th ed. 1988)).

Instead, the trial court instructed the jury as follows:

> Instruction number 8. It is your exclusive right to determine whether and to what extent a witness should be believed and . . . to give weight to his or her testimony accordingly. In evaluating the weight and credibility of a witness's testimony you must consider the witness's appearance and demeanor; the witness's manner of testifying; the witness's intelligence; the witness's candor or frankness

or lack thereof; the witness's interests if any in the result of this case; the witness's relation if any to any party; the witness's temper, feeling, or bias, if any has been shown; the witness's means and opportunities of acquiring information; the probability or improbability of the witness's testimony; the extent to which the witness is supported or contradicted by other evidence; the extent to which the witness has made contradictory statements, whether in trial or at other times; and all other circumstances surrounding the witness and bearing upon his or her credibility. . . .

The trial court further instructed the jury that "[t]he burden of proof is on the prosecution with reference to every element of a crime charged, and this burden includes the burden of proving beyond a reasonable doubt the identity of the defendant as the person responsible for the crime charged."

On January 14, 1993, the jury found Vinge guilty as to all seven counts.

### D. *Vinge's Sentencing Hearing*

On March 11, 1993, Vinge's sentencing hearing commenced. Defense counsel requested that the trial court impose only the mandatory twenty year indeterminate term of imprisonment and not any extended or consecutive terms. The prosecution instead sought consecutive terms and argued a Motion for Imposition of Consecutive Terms of Imprisonment filed on the same day, just before, the sentencing hearing. Defense counsel requested the trial court not to consider the motion because the prosecution filed its motion in an untimely manner. Despite defense counsel's protest, the trial court heard the prosecution's motion.

In support of its motion, the prosecution contended, *inter alia,* that Vinge was the leader of the Hawaiian Home Boys gang. The prosecution argued:

[The Honsport robbery] smacks of gang, and I think everyone in this courtroom can consider they've seen on our televisions and other parts of our country the gang problems that have occurred. Your Honor, we have an opportunity today, this Court has an opportunity today to not allow that to get any foothold here in this

community. . . . This is a very serious defendant who obviously from the testimony at trial clearly was the ringleader. . . . He's the one with the car. He's the one with the home at the gathering place. He's the one that's giving rise to the other individual that was shot in this case.

Although defense counsel countered that the prosecution had adduced no evidence that Vinge was a member or even a leader of a gang, the court considered Vinge's association with the Hawaiian Home Boys in determining Vinge's sentence. In considering whether to impose consecutive terms of imprisonment, the court stated:

The question is whether or not that's sufficient punishment for the—for you as an individual, for as a participant in this particular crime, for you as a member of this community, and for this community, whether or not this community can do with people like you or do without people like you is something that has to be concerned. If, indeed, you are involved in gangs then every other gang out there should look at this case and say boy, that's what's going to happen to me if I get involved with crimes. So in a sense not only does this Court look at punishment but it looks at deterrence, and in a way it looks at rehabilitation.

Now, from the facts that I recollect from this case as well as the presentence report, it appears to me that you have been in trouble before, no question about it. You do have friends who you are loyal to and who are loyal to you. You do and are involved in groups, gangs, whatever you want to call it, and that in the particular area where you live, the neighborhood where you live, the Hawaiian Homes in Pauku–kalo, that you are therefore—especially after this conviction, to say nothing of the previous convictions when you were a juvenile—definitely a danger to society. And so in your role with your friends, et cetera, that has come to an end for the time being.

As far as the Court looks at this, this is like digging out a cancer out of a community. And if we can dig this cancer out,

which is you, and get rid of it, perhaps the community can get healed, perhaps your friends can straighten out before its too late and they too get in situations like you are in today. And I guess the only thing I have to worry about, though, is whether or not the sentence that this Court imposes is going to make you fester and get worse or is going to make you understand and realize what you have done and get better.

Before sentencing Vinge, the court stated that "notwithstanding the fact that the prosecution filed the motion today, [the court] nevertheless had already considered consecutive sentences." The court further noted that: "[Vinge's] gang related activity and the—to me this looks like a gang related activity where three persons go in a premeditated, well-planned-out, thought-out robbery and burglary, requir[ed] [the] Court to look a little bit more seriously at the sentence and what the possibilities should be for [Vinge]." Reflecting on, *inter alia,* Vinge's gang-related activity, his extensive juvenile criminal record, and the extreme nature of the Honsport robbery, the court sentenced Vinge to indeterminate prison terms aggregating thirty years—twenty years for count one (first degree robbery), to run consecutively with the other counts, which were to run concurrently with each other.

Thereafter, Vinge filed a timely notice of appeal.

## II. *STANDARD OF REVIEW*

"The giving of special instructions on identification has been regarded as within the discretion of the trial judge or superfluous in the light of adequate general instructions." *State v. Okumura,* 78 Hawai'i 383, 404, 894 P.2d 80, 101 (1995) (quoting *State v. Padilla,* 57 Haw. 150, 162, 552 P.2d 357, 365 (1976)). *Accord State v. Pahio,* 58 Haw. 323, 332, 568 P.2d 1200, 1206 (1977).

■ The issues—(1) whether first degree burglary and attempted theft in the first and second degrees are included offenses of robbery in the first degree and (2) whether the trial court violated the due process clause of the Hawai'i Constitution when the prosecution failed to give adequate notice that con-

secutive sentences were at issue—are all questions of law reviewable *de novo. See United States v. Becker,* 965 F.2d 383, 391 (7th Cir.1992), *cert. denied,* 507 U.S. 971, 113 S.Ct. 1411, 122 L.Ed.2d 783 (1993); *Hopi Tribe v. Navajo Tribe,* 46 F.3d 908, 918 (9th Cir.1995).

■ As to the last issue regarding the imposition of consecutive sentences, we recognize generally that a sentencing judge has broad discretion in imposing a sentence. *Keawe v. State,* 79 Hawai'i 281, 284, 901 P.2d 481, 484 (1995) (citing *State v. Gaylord,* 78 Hawai'i 127, 143–44, 890 P.2d 1167, 1183–84 (1995)); *State v. Valera,* 74 Haw. 424, 435, 848 P.2d 376, 381, *reconsideration denied,* 74 Haw. 650, 853 P.2d 542 (1993)). "[T]o constitute an abuse [of discretion], it must appear that the [sentencing] court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Keawe,* 79 Hawai'i at 284, 901 P.2d at 484 (citing *Gaylord,* 78 Hawai'i at 144, 890 P.2d at 1184).

## III. *DISCUSSION*

### A. *Special Jury Instructions Were Unnecessary.*

■ Vinge contends that the trial court erred in denying his request for a special jury instruction regarding eyewitness identifications. Vinge argues that, because the prosecution's case hinged on the questionable testimony of a single uncorroborated eyewitness, the trial court's failure to give the requested instruction constituted an abuse of discretion. We disagree.

[I]n order to determine whether the circuit court abused its discretion, we must examine all aspects of the trial, including the opening statements, the cross-examination of prosecution witnesses, the arguments to the jury, and the general instructions given by the court, to determine whether the jury's attention was adequately drawn to the identification evidence.

*Okumura,* 78 Hawai'i at 405, 894 P.2d at 102.

For example, in *Padilla,* the defendant was positively identified by an eyewitness as the culprit in a robbery case. *Padilla,* 57

Haw. at 152, 552 P.2d at 359. A second witness testified that the defendant had characteristics similar to the person he saw committing the robbery, but was uncertain whether the defendant was the same person. *Id.* However, a third witness testified that the person did not look like the person who committed the offense. *Id.*

The defendant thereafter requested a special jury instruction relating to the weight to be given to identification testimony, the likelihood of error in identification, and the caution with which the jury should consider such testimony. *Id.* at 161, 552 P.2d at 364. The court refused. *Id.*

On appeal, this court recognized:

[I]n the circumstances of a particular case, the proof, contentions and general instructions may have so shaped the case as to convince us that in any real sense the minds of the jury were plainly focused on the need for finding the identification of the defendant as the offender proved beyond a reasonable doubt.

*Id.* at 161–62, 552 P.2d at 365 (quoting *United States v. Telfaire,* 469 F.2d 552, 556 (D.C.Cir.1972)) (citations omitted). In light of "the cross-examination of the prosecution witnesses, the arguments to the jury, and the general instructions given by the court," we held that the trial court adequately directed the jury's attention to the identification evidence and, thus, a more specific instruction was unnecessary. *Padilla,* 57 Haw. at 162, 552 P.2d at 365.

Here, the record reveals, in light of the circumstances that took place at trial, that the trial court adequately directed the jury's attention to the evidence identifying Vinge as one of the three Honsport robbers. First, defense counsel vigorously cross-examined Atai on the identification of Vinge. Second, defense counsel, during his closing argument, enumerated several reasons why Atai, the prosecution's sole eyewitness, was not worthy of the jury's belief. Third, the trial court instructed the jury, *inter alia,* that "[t]he [prosecution's] burden of proof ... includes the burden of proving *beyond a reasonable doubt* the identity of the defendant as the person responsible for the crime charged." (Emphasis added.) Under these circumstances, we believe that the jury's attention was adequately drawn to the issue of identification. Therefore, we hold that the trial court in the instant case did not abuse its discretion in refusing to give Vinge's requested jury instruction on single eyewitness identification.[9]

### B. *Vinge Could Simultaneously Be Convicted Of First Degree Robbery And First Degree Burglary But Not Of Attempted Theft In The First And Second Degree.*

Vinge contends that the trial court erred in denying his motion for judgment of acquittal on the charges of first degree burglary and attempted theft in the first and second degrees. Vinge argues that the above charges were included offenses of first degree robbery, for which Vinge was also convicted, and that his convictions for those allegedly included offenses violated HRS § 701–109 (1993).

#### 1. *Vinge's challenge of the allegedly included offenses was properly made pursuant to HRPP Rule 29(c).*

Vinge filed his motion for judgment of acquittal pursuant to Hawai'i Rules of

9. Vinge also contends the trial court erred in denying his motion to introduce a written statement that Atai made after he viewed the police's photographic line-up. In this statement, Atai wrote, *inter alia,* that photograph number two "resembled" the suspect that he saw at the Honsport robbery. Aside from (1) making a general claim that the trial court erred in denying the introduction of this written statement, and (2) contending that the statement would underscore the tentative nature of Atai's photographic identification, Vinge does not provide a single argument to support his contention that the trial court's ruling was erroneous. Accordingly, we decline to address Vinge's claim. *See State v. Lopez,* 78 Hawai'i 433, 452, 896 P.2d 889, 908 (1995) (citing *Loui v. Board of Medical Examiners,* 78 Hawai'i 21, 29 n. 19, 889 P.2d 705, 713 n. 19 (1995)).

In any event, we note that, although the trial court refused to accept Atai's actual written statement into evidence, Vinge was allowed to elicit testimony from Atai and another prosecution witness regarding the existence and actual content of the written statement in question.

Penal Procedure (HRPP) Rule 29(c), which provides:

**(c) Motion [for Judgment of Acquittal] After Discharge of Jury.** If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within 10 days after the jury is discharged or within such further time as the court may fix during the 10–day period. If a verdict of guilty is returned the court may on such motion set aside the verdict and enter judgment of acquittal. If no verdict is returned the court may enter judgment of acquittal. It shall not be necessary to the making of such a motion that a similar motion has been made prior to the submission of the case to the jury.

(Bold in original.) The prosecution contends that the court correctly dismissed Vinge's motion for judgment of acquittal because: (1) Vinge failed to make an insufficiency of evidence claim, which it claims was required by HRPP Rule 29(c); and (2) Vinge is alleging defects in the charge which should have been challenged in a pre-trial motion to dismiss pursuant to HRPP Rule 12(b)(2).[10] We disagree.

First, HRPP Rule 29(c) does not require that Vinge make an insufficiency of evidence claim. The prosecution seems to confuse HRPP Rule 29(c) with HRPP Rule 29(a).[11] Second, HRS § 701–109 prohibits a defendant from being convicted of more than one offense if one offense is included in the other, regardless of whether the defendant has filed a HRPP Rule 12 motion to dismiss. Third, nothing in the language of HRPP Rule 29(c) prohibits Vinge from making a motion for

judgment of acquittal as to the allegedly included offenses of which he was convicted. Accordingly, Vinge's challenge of the allegedly included offenses was properly made pursuant to HRPP Rule 29(c).

2. *The court erred in denying Vinge's motion for judgment of acquittal for his convictions of attempted theft in the first and second degrees.*

a. *Attempted theft in the first and second degrees are included offenses of first degree robbery.*

■ "[A]n offense is a lesser included offense of another if it satisfies the requirements set forth in HRS § 701–109(4) which codifies the common law doctrine of lesser included offense." *State v. Kinnane,* 79 Hawai'i 46, 50, 897 P.2d 973, 977 (1995) (quoting *State v. Alston,* 75 Haw. 517, 532–33, 865 P.2d 157, 166 (1994)) (internal quotation marks omitted).

HRS § 701–109 (1993) provides in relevant part:

**Method of prosecution when conduct establishes an element of more than one offense.** (1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense if:

(a) One offense is included in the other, as defined in subsection (4) of this section[.] . . . .

(4) A defendant may be convicted of an offense included in an offense charged in

---

10. HRPP Rule 12(b)(2) provides:
**(b) Pretrial Motions.** Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or oral at the discretion of the judge. The following must be raised prior to trial:
. . . .
(2) defenses and objections based on defects in the charge (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings)[.]
(Bold in original.)

11. HRPP Rule 29(a) provides in relevant part:
**(a) Motion Before Submission to Jury.** Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place. The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses alleged in the charge after the evidence on either side is closed *if the evidence is insufficient to sustain a conviction of such offense or offenses* . . . .
(Bold in original and emphasis added.)

the indictment or the information. An offense is so included when:

(a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

(b) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or

(c) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission.

(Bold in original.) "Under subsection (a), 'an offense is included if it is impossible to commit the greater without also committing the lesser.'" *Kinnane,* 79 Hawai'i at 51, 897 P.2d at 978 (quoting *Alston,* 75 Haw. at 533, 865 P.2d at 166) (citation and internal quotation marks omitted).

■ Here, Vinge was convicted, *inter alia,* of attempted theft in the first and second degrees and first degree robbery in violation of HRS § 708–840(1)(b)(ii). As we have indicated *supra* at note 1, HRS § 708–840(1)(b)(ii) (1993) provides in relevant part:

A person commits the offense of robbery in the first degree if, *in the course of committing theft*[,] ... he is armed with a dangerous instrument and ... threatens the imminent use of force against the person of anyone who is present with intent to compel acquiescence to the ... escaping with the property.

(Emphasis added.) HRS § 708–842 (1993) provides that "[a]n act shall be deemed 'in the course of committing theft' if it occurs *in an attempt to commit theft, in the commission of theft,* or in the flight after the attempt or commission." (Emphasis added.) Accordingly, in order for the prosecution to prove that a defendant committed robbery in the first degree, the prosecution must also prove—as an element of first degree robbery—all the elements of theft or attempted theft. Therefore, because (1) theft is an element of first degree robbery, (2) a defendant cannot commit first degree robbery without committing theft or attempted theft,

and (3) attempted theft is an included offense of theft, *see* HRS § 701–109(4)(b), we hold that theft and attempted theft, regardless of degree, are included offenses of first degree robbery.

b. *The charges of first degree robbery and attempted theft in the first and second degrees did not constitute separate acts.*

■ The prosecution argues that, even if, as a general proposition, attempted theft in the first and second degrees are included offenses of first degree robbery, the attempted theft charges should not be considered included offenses in this case because each charge constituted a separate criminal act supported by its own factual evidence. We disagree.

As we recognized in *State v. Horswill,* 75 Haw. 152, 161–62, 857 P.2d 579, 584 (1993),

[a] defendant may not be convicted of both charged offenses if one is an "included" offense as defined by HRS § 701–109(4). *State v. Decenso,* 5 Haw.App. 127, 134–35, 681 P.2d 573, 579 (1984). However, where two different criminal acts are at issue, supported by different factual evidence, even though separated in time by only a few seconds, one offense cannot be included in the other. *Id.,* at 135, 681 P.2d at 580 (citing *State v. Pia,* 55 Haw. 14, 19, 514 P.2d 580, 584–85 (1973)).

In *State v. Martin,* 62 Haw. 364, 368, 616 P.2d 193, 196 (1980), we ruled:

[T]he applicable test for determining whether there is a continuing crime "is whether the evidence discloses one general intent or discloses separate and distinct intents." ... [I]f "there is but one intention, one general impulse, and one plan, even though there is a series of transactions, there is but one offense."

(Quoting *People v. Howes,* 99 Cal.App.2d 808, 818, 222 P.2d 969, 976 (1950)).

Here, Vinge threatened Officer Aveiro with a machete while attempting to steal, *inter alia,* guns and ammunition. Under these facts and as discussed *supra,* Vinge could be convicted of either first degree robbery or attempted theft because, pursuant to HRS §§ 701–109(1)(a), –109(4)(a), and

–109(4)(b), attempted theft is an included offense of robbery. Vinge could not be convicted of both robbery and attempted theft because Vinge acted with only one general intent (*i.e.*, the intent to steal). Vinge's threat to use the machete arose while Vinge was "in the course of committing theft[.]" *See* HRS § 708–840(1)(b)(ii). Under the facts of this case, Vinge's conduct, *i.e.*, his attempt to steal, was continuous and not separated in time as to constitute a separate criminal act. Therefore, because Vinge acted with one general intent and because his conduct was continuous, we hold that the charges of first degree robbery and attempted theft in the first and second degrees did not involve severable criminal acts.

Accordingly, because attempted theft is an included offense of first degree robbery, and because the charges in this case were not based on severable criminal acts, we further hold that the trial court erred when it failed to grant Vinge's motion for judgment of acquittal as to the included offenses of attempted theft in the first and second degrees.

### 3. First degree burglary is not an included offense of first degree robbery.

■ Vinge also contends that the court erred in failing to grant his motion for judgment of acquittal as to the charge of first degree burglary because he claims that first degree burglary was an included offense of first degree robbery. We disagree.

First degree burglary requires, *inter alia*, that a defendant "intentionally enter[ ] or remain[ ] unlawful[ly] in a building[.]" HRS § 708–810. First degree robbery includes no such element. Accordingly, it is possible for a defendant to commit first degree robbery without committing first degree burglary. For example, if a defendant robs a victim at gunpoint on a public street, the defendant may be convicted of first degree robbery but cannot be convicted of first degree burglary, because the defendant did not enter or remain unlawfully in a building. In other words, nothing in the language of HRS § 708–840(1)(b)(ii) requires the prosecution to prove the elements of burglary before a defendant may be convicted of first degree robbery. *Cf. State v. Alvey*, 2 Haw.App. 579, 580–81, 637 P.2d 780, 781 (1981) (holding that second degree theft is not an included offense of first degree burglary because second degree theft includes an element of theft which is not included in burglary). Consequently, we hold that first degree burglary is not an included offense of first degree robbery, and the court did not err when it dismissed Vinge's motion for judgment of acquittal as to Vinge's conviction of first degree burglary.[12]

12. We further note that under HRS § 701–109(1)(d) (1993), robbery in the first degree (HRS § 708–840 (1993)) is not a specific instance of the general conduct of burglary in the first degree (HRS § 708–810 (1993)). HRS § 701–109(1)(d) states in pertinent part:

§ 701–109 **Method of prosecution when conduct establishes an element of more than one offense.** (1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense if:

\* \* \* \* \* \*

(d) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct[.]

This court has interpreted the meaning of HRS § 701–109(1)(d) in *State v. Freeman*, 70 Haw. 434, 774 P.2d 888 (1989) and *State v. Hoopii*, 68 Haw. 246, 710 P.2d 1193 (1985). In *Hoopii*, we were asked to determine if rape and sodomy were specific instances of the general conduct of kidnapping. Because the penal statutes which the defendant was charged with were enacted to redress different types of conduct, we held that

[The kidnapping and rape/sodomy] statutes do not seek to redress the same conduct. The main thrust of the kidnapping statute is to prohibit the intentional restraint of another's freedom of movement. The additional requirement of intent merely serves to distinguish kidnapping from unlawful imprisonment. *See* Commentary on §§ 707–720 to 707–722. Meanwhile, the rape and sodomy statutes are primarily concerned with preventing another from being forced to engage in sexual acts. Rape and sodomy, therefore, are not derivatives of kidnapping.

*Id.* at 251, 710 P.2d at 1196–97.

In the present case, Vinge was charged with burglary in the first degree, HRS § 708–810, and robbery in the first degree, HRS § 708–840.

As in *Hoopii*, Vinge was charged under two statutes with separate and distinct types of conduct which the legislature intended to prohibit. HRS § 708–810 was enacted primarily to pre-

### C. *Vinge's Sentence Was Improper.*

The remaining issues on appeal challenge Vinge's sentence to consecutive terms of imprisonment. Vinge argues that: (1) the trial court violated his right to due process under the Hawai'i Constitution when it failed to give him notice of its intent to impose consecutive sentences; and (2) the trial court violated his first amendment right to freedom of association and his right to due process under the Hawai'i and United States Constitutions when the sentencing court relied on his association with the Hawaiian Home Boys as a basis for imposing consecutive sentences.

### 1. *Vinge received adequate notice that consecutive sentences may be imposed by the sentencing court.*

 Vinge contends that he was not afforded adequate notice of the sentencing court's intention to impose consecutive sentences and, therefore, that the sentencing court violated his due process rights under the United States and Hawai'i constitutions.[13] We believe that Vinge's due process rights were not violated because: (1) by statute, a sentencing court has the discretion to impose consecutive sentences in matters involving multiple offenses, regardless of whether the prosecution seeks such sentences; (2) the defendant was afforded adequate notice via: (a) written indictment of the grand jury charging him with multiple counts, thereby informing Vinge that he may be subject to consecutive sentences; (b) the jury's verdict; (c) written and oral notice of the prosecution's motion for consecutive sentences; (d) the plain language of HRS § 706–668.5 (1993), which informs the defendant that he

may be sentenced to consecutive sentences; (e) defense counsel who was obligated to inform the defendant of the consequences of being charged with multiple offenses via Hawai'i Rules of Professional Conduct Rule 1.4 (1995); and (3) HRS § 706–668.5 does not expressly require that defendant receive notice before receiving consecutive sentencing.

Vinge's contention that due process requires that he be afforded notice before receiving consecutive terms of imprisonment stems from the line of reasoning announced in *State v. Schroeder,* 76 Hawai'i 517, 880 P.2d 192 (1994). In *Schroeder,* we held that "before a defendant may be sentenced to a mandatory minimum term of imprisonment pursuant to HRS § 706–660.1, due process requires that he or she must ... be given reasonable notice of its intended application and afforded the opportunity to be heard." *Id.* at 531, 880 P.2d at 206. In reaching this holding, we relied on the principle that

> [t]he purpose of notice is to insure that interested parties are apprised of the pendency of any proceedings which is to be accorded finality. *Freitas v. Gomes,* 52 Haw. 145, 472 P.2d 494 (1970). Given notice, parties are able to determine how to respond and prepare for the issues involved in the hearing. *Oyler v. Boles,* [368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962).]

*Id.* (quoting *State v. Melear,* 63 Haw. 488, 499, 630 P.2d 619, 627–28 (1981)).

In the present case, the issue is not whether Vinge was "apprised of the pendency of the proceeding," but, rather, whether Vinge was given adequate notice of the possibility

---

vent the commission of a theft in a building, whereas, HRS § 708–840 was enacted to prevent the use of force in the commission of a theft.

Because the legislature intended to redress two different scenarios of theft, we hold that HRS § 701–109(1)(d) does not prohibit a defendant from being charged with violations of HRS § 708–810 (burglary in the first degree) and HRS § 708–840 (robbery in the first degree).

**13.** The fourteenth amendment to the United States Constitution provides in relevant part:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall

make or enforce any law which shall abridge the privileges or immunities of citizens of the United States: nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. U.S. Const. amend. XIV, § 1.

Article I, section 5 of the Hawai'i Constitution states:

No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry.

322

of receiving a sentence of consecutive terms of imprisonment. As we have noted, Vinge received notice that he might be subject to consecutive terms of imprisonment via the Grand Jury Indictment where he was indicted on seven different counts of criminal activity. In addition, the jury's verdict of guilty as to all seven counts placed Vinge on constructive notice. In other words, being indicted and convicted of multiple offenses, Vinge was placed on notice that he was subject to the provisions of HRS § 706–668.5, which provides for consecutive sentences.[14]

The plain language of HRS § 706–668.5, which sets forth the statutory framework for multiple sentences, provided Vinge with notice of the possibility that consecutive sentences could be imposed. HRS § 706–668.5 provides:

**Multiple sentence of imprisonment.** (1) If multiple terms of imprisonment are imposed on a defendant at the same time, or if a term of imprisonment is imposed on a defendant who is already subject to an unexpired term of imprisonment, the terms may run concurrently or consecutively. Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms run consecutively.

**14.** Vinge also received a copy of the prosecution's motion for consecutive sentences; however, it was filed on the morning of the sentencing hearing.

**15.** HRS § 706–606 (1993) provides:
**Factors to be considered in imposing a sentence.** The court, in determining the particular sentence to be imposed, shall consider:
(1) The nature and circumstances of the offense and the history and characteristics of the defendant;
(2) The need for the sentence imposed:
(a) To reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense;
(b) To afford adequate deterrence to criminal conduct;
(c) To protect the public from further crimes of the defendant; and
(d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) The kinds of sentences available; and
(4) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms run concurrently.

(2) The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider the factors set forth in section 706–606.[15]

(Bold in original.)

■ Thus, it is clear that under HRS § 706–668.5, a defendant convicted of multiple offenses may, in the court's discretion, receive terms that run concurrently or consecutively.[16] With this in mind, an attorney preparing for a client's sentencing hearing is obligated to prepare for the eventuality that a prosecutor will seek the maximum term of imprisonment.[17] And, given the factors set forth in HRS § 706–606, defense counsel is further obligated "to determine how to respond and prepare for the issues involved in the hearing." Schroeder, 76 Hawai'i at 531, 880 P.2d at 206.

Moreover, although similar statutory sentencing provisions require notice and a hearing, HRS § 706–668.5 is devoid of any such language.[18] Because HRS § 706–668.5 does

(Bold in original.) For a general discussion of the relationship between HRS §§ 706–606 and 706–668.5, see State v. Gaylord, 78 Hawai'i 127, 147–50, 890 P.2d 1167, 1187–90 (1995).

**16.** Although the sentencing court has discretion to impose concurrent or consecutive sentences under HRS § 706–668.5(2), the trial court is limited in its discretion by the factors set forth in HRS § 706–606. Gaylord, 78 Hawai'i at 149, 890 P.2d at 1189.

**17.** Furthermore, Hawai'i Rules of Professional Conduct (HRPC) Rule 1.4(a) requires a lawyer to "keep a client reasonably informed about the status of a matter...." Accordingly, defense counsel has the professional obligation to informed Vinge of the possibility of consecutive sentences.

**18.** For example, HRS § 706–657 (1993) (enhanced sentence for second degree murder) requires a hearing before imposition of the enhanced sentence; HRS § 706–662 (1993) (criteria for extended terms of imprisonment) requires the court to make findings, and, thus, notice and a hearing are required; HRS § 706–664 (procedure for imposing extended

not contain any such notice provision, we may infer that none is required provided that it comports with the requirements of due process. As discussed *supra*, due process concerns were satisfied by the several forms of notice that Vinge received before his sentencing.[19]

Accordingly, we hold that the sentencing court did not violate Vinge's due process rights under the United States Constitution or the Hawai'i Constitution.

2. *The sentencing court exceeded its authority when the court considered Vinge's association with the Hawaii Home Boys as a basis for sentencing Vinge to consecutive terms of imprisonment.*

Finally, Vinge contends that the sentencing court violated his first amendment right to freedom of association and to due process, under the Hawai'i and United States Constitutions, when it relied on Vinge's association with the Hawaiian Home Boys as a basis for imposing consecutive sentences. We begin our analysis by addressing whether the sentencing court exceeded its statutory authority under HRS § 706–668.5, which requires, *inter alia*, "[t]he court, in .determining whether the terms imposed are to be ordered to run ... consecutively, [to] consider the factors set forth in section 706–606." *See supra* note 14.

In ascertaining the defendant's "characteristics" for the purposes of HRS § 706–606(1), we recognized in *Keawe, supra*, that "a sentencing court may consider any and all accurate information that *reasonably* might bear on the proper sentence for the particular defendant, given the crime committed." (Emphasis added and citation omitted.)

█ Here, the sentencing court considered Vinge's association with the Hawaiian Home Boys as an aggravating factor in deciding whether to impose consecutive terms of imprisonment. In sentencing Vinge, the court stated, *inter alia*, that:

You[, Vinge,] do and are involved in groups, gangs, whatever you want to call it, and that in the particular area where you live, the neighborhood where you live, the Hawaiian Homes in Paukukalo, that you are therefore—especially after this conviction, to say nothing of the previous convictions when you were a juvenile—definitely a danger to society.

Thus, in light of our recognition that a sentencing court may only consider accurate information "that reasonably might bear on the proper sentence for the particular defendant, given the crime committed," the question arises whether the sentencing court had sufficient evidence before it to establish a reasonable correlation between Vinge's association with the Hawaiian Home Boys and the imposition of consecutive terms of imprisonment. *See Keawe*, 79 Hawai'i at 286, 901 P.2d at 486.

█ In *United States v. Lemon*, 723 F.2d 922 (D.C.Cir.1983), the United States Court of Appeals for the District of Columbia outlined a three-part test to determine the sufficiency of "membership" evidence at sentencing. The court held that membership evidence may not be considered for purposes of imposing punishment unless the evidence is sufficient to establish that: (1) the defendant was a "member" of the group at issue; (2) the group's aims were illegal; and (3) the defendant intended to further those illegal aims. *Id.* at 940. The *Lemon* court held that the sentencing judge's reliance on information regarding the defendant's alleged association with the "Black Hebrews" was improper absent any evidence linking the defendant to any illegal activities of the group. The court cautioned that the first amendment would be violated "if the defendant's illegal intent could simply be inferred from evidence of his association with members of the group." *Id.* at 940. The court further explained: "[T]here must be sufficiently reliable evidence of the defendant's connection to illegal activity within the Black Hebrews to insure that he is not

---

terms of imprisonment) requires a hearing before imposing an extended term.

19. Regardless of whether notice is required, Vinge received actual oral and written notice of the prosecution's intention to seek consecutive sentences.

**324**

being given a harsher sentence for mere association with the group and its legitimate aims and activities." *Id.*

The reasoning of *Lemon* controls the determination as to whether there was sufficient evidence to establish a reasonable correlation between Vinge's association with the Hawaiian Home Boys and the imposition of consecutive terms of imprisonment. Like the defendant in *Lemon,* Vinge was given a harsher sentence, in part, for his mere association with a group. The prosecution, in the instant case, never established, either during Vinge's trial or at his sentencing hearing, that the Hawaiian Home Boys were engaged in, or even endorsed, illegal activities or that Vinge's criminal actions were in furtherance of any such illegal activities. At most, the record reveals that: (1) Vinge and his neighborhood friends lived in the Hawaiian Homes area; (2) being proud of where they lived, Vinge and his friends called themselves the Hawaiian Home Boys; and (3) as Hawaiian Home Boys, they watched television, carpooled, fished, and were active in a boxing club, called the Hawaiian Home Boxing Club. Accordingly, on the record before us, we hold that there was insufficient evidence to establish any type of reasonable correlation between Vinge's association with the Hawaiian Home Boys and the imposition of consecutive prison sentences.

While Vinge's past criminal record and the egregious facts surrounding the Honsport robbery may independently support a sentence of consecutive terms of imprisonment, the sentencing court's remarks during Vinge's sentencing hearing clearly indicate that Vinge's association with the Hawaiian Home Boys, *i.e.,* his "gang-related activity," was an aggravating factor in the sentencing court's decision to impose consecutive sentences. Because Vinge's mere association with the Hawaiian Home Boys bore no reasonable relationship to the consecutive sentences imposed and because Vinge's supposed "gang-related activity" clearly served as an aggravating factor in imposing his sentence, we hold that the sentencing court exceeded its statutory authority when it considered Vinge's "membership" with the Ha-

waiian Home Boys as a basis for sentencing Vinge to consecutive terms of imprisonment.

### IV. CONCLUSION

For the above mentioned reasons, we affirm Vinge's guilty convictions on all charges except for the included offenses of attempted theft in the first and second degrees, which we reverse. Furthermore, we vacate Vinge's sentence and remand this case for resentencing.